*Charles A. Peterson, et al. v. Evapco, Inc., et al.*, No. 778, Sept. Term, 2016
Opinion by Leahy, J.


**Courts > Personal Jurisdiction > Consent to Jurisdiction**
In a case arising out of a contract designating Maryland as the forum state, a Maryland court can exercise personal jurisdiction over a non-resident party who did not sign the contract but was closely related to the contractual relationship at issue.

**Courts > Personal Jurisdiction > Consent to Jurisdiction**
To determine whether a forum-selection clause is enforceable against a non-signatory, we look to whether the forum-selection clause was valid, whether the claims arose from the non-signatory's status in relation to the agreement containing the forum-selection clause, and whether the non-signatory was closely related to that agreement, so that it was foreseeable that they would be bound by the forum-selection cause contained in the agreement.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 778

September Term, 2016

---

CHARLES A. PETERSON, *et al.*

v.

EVAPCO, INC., *et al*.

---

Meredith,
Leahy,
Salmon, James P.
   (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Leahy, J.

---

Filed:  July 5, 2018

The central issue we must address in this appeal is whether, in a case arising out of a contract designating Maryland as the forum state, a Maryland court can exercise personal jurisdiction over a non-resident party who did not sign the contract but was "closely related" to the contractual relationship at issue. We adopt the relatively nascent "closely related" doctrine embraced by most federal and state jurisdictions that have considered applying it.

Featured in this case are North Carolina residents Charles A. Peterson and Carmen A. Peterson, who founded, owned, and operated Tower Components, Inc. ("TCI") in North Carolina from 1990 to 2005. They sold TCI in 2005 through a stock purchase agreement ("SPA") to a Maryland company, Evapco Products ("EvapProducts"). EvapProducts is a holding company that Evapco, Inc., another Maryland company, created to hold TCI's stock. At the time of the sale, Mr. Peterson—but not Mrs. Peterson—signed a separate "Confidentiality and Intellectual Property Agreement" (the "Confidentiality Agreement" or "Agreement") and continued to work for TCI.

The Confidentiality Agreement prohibited Mr. Peterson from using confidential information "in any way detrimental" to the interests of Evapco, Inc. or its subsidiary companies. The Agreement also included a non-compete clause and designated Maryland as the forum in which to resolve any disputes arising from it. Mr. Peterson continued to work for TCI as a sales manager until 2014 when TCI fired him for conducting business in direct competition with Evapco, Inc. and its subsidiaries via two LLCs that he and his wife wholly owned: American Cooling Tower Products, LLC ("ACTP") and Evergreen Composite Technology, LLC ("Evergreen").

Evapco, Inc. and its wholly-owned subsidiaries, EvapTech, Inc. ("EvapTech"), EvapProducts, and TCI (collectively, "Appellees," "Evapco," and plaintiffs below), filed suit in the Circuit Court for Carroll County for injunctive relief and damages against Mr. and Mrs. Peterson, ACTP and Evergreen (collectively, "Appellants" and defendants below). The plaintiffs alleged, mainly, that Mr. Peterson breached the Confidentiality Agreement and that the other defendants tortiously interfered with the Confidentiality Agreement and with Evapco's prospective advantage. The defendants moved to dismiss Mrs. Peterson, ACTP, and Evergreen for lack of personal jurisdiction, but the court denied the motion. The contentious litigation that ensued took a relatively unusual course after the court entered a default judgment against the defendants as a spoliation sanction and reserved only the issues of injunctive relief and damages to be tried before the court.

Appellants challenge the circuit court's exercise of personal jurisdiction over Mrs. Peterson, Evergreen, and ACTP. We hold that those parties consented to jurisdiction in Maryland because (1) the Confidentiality Agreement contained a valid forum-selection clause; (2) Evapco's claims arose out of the non-signatory Appellants' status in relation to the Confidentiality Agreement; and (3) Mrs. Peterson, Evergreen, and ACTP were closely related to the Confidentiality Agreement, thus making it foreseeable that the forum-selection clause would be enforced against them. The remaining issues that Appellants raise on appeal stem largely from the court's spoliation sanction and the procedural rulings that followed. Discerning no error or abuse of discretion, we affirm those rulings.

## BACKGROUND

### A.  The Corporate Parties

Evapco, Inc. is a Maryland manufacturing company that was founded in 1976 and has its world headquarters in Taneytown, Maryland.  The company provides service and products in the commercial HVAC, industrial process, power, and industrial refrigeration markets.  Evapco, Inc. manufactures products at 19 locations throughout nine countries and supplies products via a sales network of more than 170 offices.

EvapTech is also a Maryland company, but its principal place of business is in Lenexa, Kansas.  Founded in 2005, EvapTech conducts research and development in the industrial refrigeration and HVAC evaporative cooling tower markets.  It also designs, constructs, rebuilds, and repairs large field-erected cooling towers and conducts aftermarket purchases and sales.

EvapProducts, another Maryland corporation, is principally located in Maryland and serves as the holding company for TCI's stock.  The Petersons founded TCI as a North Carolina corporation in or around 1990.  TCI manufactures and sells components for cooling towers and heat exchangers, including Opti-Bar and Opti-Grid.  TCI not only sells these products to third-party purchasers, but also supplies them to Evapco to be incorporated into the cooling towers that Evapco manufactures and sells, and to EvapTech for its field-erected cooling towers.

After they sold TCI to EvapProducts, Mr. and Mrs. Peterson formed ACTP, a North Carolina LLC, in October of 2012.  They maintained its principal place of business at their home in North Carolina until they dissolved the company on June 20, 2015, after the

3

underlying complaint was filed. ACTP was in the business of buying and selling cooling tower parts. Although Mr. Peterson claimed in his answers to interrogatories that he "had no involvement with the business," the record reveals that he was ACTP's registered agent and manager and that he signed checks and tax forms on ACTP's behalf.

Evergreen was a Georgia LLC that the Petersons formed in 2007 and dissolved on May 9, 2015, roughly six weeks before they dissolved ACTP. The ownership and business of Evergreen was contested throughout the underlying proceedings,[1] but Appellees agree with Mrs. Peterson's most recent testimony that she owned 51% and her husband owned 49%. Although Mrs. Peterson described Evergreen in her affidavit as a company that "was in the business of manufacturing composite decking materials," a credit application that Mr. Peterson signed described Evergreen's business as the "[r]esale of cooling tower parts." The circuit court ultimately found that both ACTP and Evergreen operated in competition with Evapco.[2]

---

[1] In Mrs. Peterson's affidavit supporting the plaintiffs' motion to dismiss, she stated that she was the majority owner until 2010 when Mr. Peterson took over as majority owner. Mr. Peterson provided a similar explanation in his response to an interrogatory, claiming that he held a 44% ownership interest in Evergreen until it ceased active operations, at which point he assumed a 100% interest in the company. But, in a February 2011 credit application, Mr. Peterson claimed to have a 50% interest, and later testified in his January 13, 2016, deposition that Mrs. Peterson remained the 51% owner through May 9, 2015. Similarly, Mrs. Peterson testified at her deposition on November 11, 2015, that she believed she owned 51% of the company.

[2] In his answers to interrogatories dated May 8, 2015, Mr. Peterson stated: "Evergreen was not ever engaged in the business of heat exchange or cooling tower systems or components. I did, however, use Evergreen as a vehicle on some occasions to process sales transactions with TCI customers which the EVAPCO entities were not interested in handling[.]"

## B. The Sale of TCI

In 2005, EvapProducts purchased all of TCI's stock from the Petersons for roughly $3.76 million. According to Evapco, Inc. President and CEO, William Bartley, TCI was targeted for acquisition, in part, because it produced a product called "Opti-Bar, which ha[s] [] kind of an industry reputation as the best, most efficient splash bar in the [cooling tower] market." In consideration for the purchase of TCI stock, the parties entered into the Confidentiality Agreement, without which Evapco "would not have entered into and consummated" the SPA. Mr. Peterson, but not his wife, signed the Confidentiality Agreement. The Confidentiality Agreement contained an assignment clause that provided in relevant part:

> I [Mr. Peterson] acknowledge and agree that all work product, designs, specifications, drafts, memorand[a], ideas, know how, trade secrets, inventions, improvements, modifications, enhancements and any other work product previously produced, currently produced, or produced in the future by me, solely or jointly with others while employed at [Evapco] (collectively, the "Work Product") was, is, and shall be work for hire and created to be owned by Evapco and, to the extent that any such Work Product was or is not work made for hire, for no additional consideration, I hereby assign over to Evapco all of my right, title and interest in and to such Work Product[.]

The Confidentiality Agreement required Mr. Peterson to keep accurate records, which would remain Evapco's property, and to surrender those records to Evapco in the event of his termination. It imposed a duty on Mr. Peterson to keep confidential all information Evapco communicated to him during his tenure with TCI. Additionally, the Agreement contained a restrictive covenant that prohibited Mr. Peterson, "at all times during [his] employment with Evapco" from "engag[ing] in any activity, directly or indirectly, that competes with Evapco or otherwise compromises its interests." By signing

5

the Confidentiality Agreement, Mr. Peterson agreed "not to compete with Evapco for two (2) years from the later of the date of th[e] Agreement or the date my employment with Evapco ends[,]" and further acknowledged that

> I shall be competing with Evapco if I participate, or engage in, or carry on directly or indirectly, within the continental United States or any foreign country within which Evapco has operations or representative sales offices at the time of my termination from employment with Evapco, for myself or on behalf of any person, partnership, corporation or other entity, any business that designs, manufactures, licenses, leases or sells goods or services that are, as of the date of termination of my employment with Evapco: (i) also offered by Evapco; (ii) under development by Evapco to bring to market in the future; or (iii) subject to plans by Evapco to bring to market in the future by means of either a business acquisition or the hiring of persons with expertise to develop such goods or services.

The Confidentiality Agreement was governed by Maryland law and specified that "[a]ll claims hereunder shall be tried solely and exclusively in the Circuit Court for Carroll County (or if subject matter jurisdiction exists, in the United States District Court for the District of Maryland, Northern Division), and the parties consent to the sole and exclusive jurisdiction and venue of such court, regardless of where I [Mr. Peterson] am residing at the time[.]"

### C. Mr. Peterson's Tenure at TCI

Incidental to the SPA, Mr. Peterson continued working for TCI as a sales manager. His duties included managing TCI's relationships with its customers as well as procuring and bidding on outside sales. In the spring of 2014, TCI discovered that, since at least 2009, Mr. Peterson was engaging in business activities "that not only distracted from performing his duties at TCI, but were also in direct competition with the business of [Evapco.]" Specifically, TCI accused Mr. Peterson of, individually and through Evergreen

6

and ACTP, selling products and cooling tower parts made by Evapco's competitors to Evapco's actual and prospective customers; manufacturing replica TCI and EvapTech products to sell to Evapco's actual and prospective customers; and diverting a project from Evapco by submitting a bid to a general contractor through Evergreen. Evapco, Inc. CEO, William Bartley, later testified that he heard rumors of Mr. Peterson's side dealing but the "last [] straw" was when Mr. Peterson "had become careless" and left a purchase order from Evergreen in a copy machine at TCI's office. Mr. Bartley told him, "We know what you are doing, so, now you need to leave and you can't compete for two years. This is what your agreement says." TCI terminated Mr. Peterson on July 29, 2014.

### D. North Carolina Employment Hearing

Mr. Peterson filed for unemployment benefits, and an adjudicator with North Carolina's Division of Employment Security denied his claim, finding that TCI had terminated him for misconduct connected with his work. On January 27, 2015, an appeals referee held a hearing in Mr. Peterson's administrative appeal of that decision. *In the Matter of Charles A. Peterson, Senior and Tower Components, Inc.*, Appeals Decision No. VII-A-87271.

At the hearing, Mr. Brian Colwell, the General Manager of TCI, testified that TCI fired Mr. Peterson for breach of the Confidentiality Agreement. According to Mr. Colwell, TCI had been receiving invoices from EvapTech's competitors, care of Mr. Peterson, for components that TCI did not supply. TCI investigated and discovered that Mr. Peterson was purchasing the parts for Evergreen and that Evergreen was paying for the purchases. After Mr. Colwell discovered an Evergreen purchase order from a competitor in TCI's

7

copy machine, TCI terminated Mr. Peterson for appropriating confidential information and business opportunities.

Mr. Colwell clarified that TCI had been aware that Mr. Peterson owned Evergreen during his employment with TCI. In fact, TCI had permitted Mr. Peterson to conduct business on TCI's behalf through Evergreen with Grupo Unitherm, one of TCI's prior customers in Mexico that wanted to continue working with Mr. Peterson directly.[3] Mr. Colwell insisted that Mr. Peterson's sales to Grupo Unitherm through Evergreen were not the cause for his termination. Instead, TCI fired Mr. Peterson because Evergreen sold products to TCI customers that TCI did not supply, and Mr. Peterson had not made him or EvapTech aware of the other sales. On cross-examination, however, Mr. Colwell admitted that he never gave Mr. Peterson any sort of formal warning. In a decision that emphasized TCI's prior knowledge of Mr. Peterson's activities and failure to instruct him to stop, the appeals referee reversed the adjudicator's decision and held that "the evidence fails to show that [Mr. Peterson] was discharged from the job for misconduct connected with the work."

### E. The Underlying Case

### 1. The Initial Complaints

Just shy of five months after Mr. Peterson's termination from employment, TCI, along with Evapco and EvapTech, filed a complaint on December 22, 2014, against

---

[3] Mr. Colwell testified, "Those orders were processed . . . through Evergreen and that was [] understood. I understood that agreement. Mr. Peterson understood that agreement that, for that particular customer, when they were buying our products, *any TCI products that we supply directly and made here*, that [] was handled through Mr. Peterson being Evergreen[.]" (Emphasis added).

8

"Charles A. Peterson, II" in the Circuit Court for Carroll County. The complaint described Mr. Peterson's surreptitious business activities, and alleged, *inter alia*, that following his termination, Mr. Peterson failed to return work product, including confidential and proprietary documents and emails. It also alleged that Mr. Peterson conducted TCI business through his personal email address, optigrid@aol.com—named after TCI's product—and that he continued conducting business through optigrid@yahoo.com on behalf of Evergreen and ACTP following his termination. Finally, the complaint alleged that, via Evergreen and ACTP, Mr. Peterson was procuring cooling tower parts from Evapco's competitors that Evapco also offered, and then sold those products to TCI's customers or prospective customers and kept the profits on those transactions.

The complaint contained three counts: (1) breach of the Confidentiality Agreement, with a request for damages over $75,000 and an injunction ordering Mr. Peterson to return all TCI work product and confidential information, and prohibiting him from competing against Evapco for two years; (2) misappropriation of trade secrets in violation of North Carolina law, with a request for injunctive relief and punitive damages; and (3) unfair and deceptive trade practices in violation of the North Carolina Deceptive Trade Practices Act ("NCDTPA"), with a request for, *inter alia*, injunctive relief, a money award representing Mr. Peterson's illegal gains and plaintiffs' lost profits, as well as treble damages.

*First and Second Amended Complaint*

Following a perfunctory amendment in February 2015 to delete the "II" from "Charles A. Peterson," the complaint was amended a second time on May 29, 2015, to join EvapProducts as a plaintiff and to add Mrs. Peterson, ACTP, and Evergreen as defendants.

9

Evapco alleged that Mr. Peterson deleted TCI-related emails from his work computer before he returned it to TCI. Evapco also added Mrs. Peterson, ACTP, and Evergreen to the North Carolina statutory counts, and added two more counts to the complaint against them: tortious interference with contractual relations and tortious interference with prospective advantage.

Mr. Peterson filed his second answer on July 31, again denying plaintiffs' claims, and this time denying any ownership interest in or serving as a Vice President of ACTP. He also denied that Mrs. Peterson was the owner and President of Evergreen and denied that he or his wife "exercised 'complete dominion and control over the affairs'" of the two LLCs, as plaintiffs alleged. His answer asserted fourteen affirmative defenses—including that the Confidentiality Agreement was unenforceable as "overly broad, unreasonable as applied here, and not necessary to protect any legitimate business interests of Plaintiff[s]."

## 2. Motion to Dismiss

The same day that Mr. Peterson filed his second answer, the three remaining defendants filed a joint motion to dismiss for lack of personal jurisdiction. In it, Mrs. Peterson claimed that she had no connection to Maryland other than the sale of TCI to EvapProducts in 2005. She argued that she "never worked for Evapco, never signed [the Confidentiality Agreement], and never consented to jurisdiction in Maryland[,]" and that "[e]ven if she had signed the same [Confidentiality] Agreement that Mr. Peterson signed in 2005, it would have expired in 2007, two years after she signed it[,]" because she never worked for Evapco. She rejected the idea that her purported awareness or knowledge of the Confidentiality Agreement could possibly form the basis for jurisdiction, and included

10

an affidavit with the motion in which she stated that, "[u]ntil this dispute arose,[4] I was not aware of the terms of Mr. Peterson's Confidentiality and Intellectual Property Agreement with TCI, including its non-compete and jurisdiction provisions."

ACTP and Evergreen asserted that they had no contact with Maryland, and bare, conclusory allegations that individual defendants "exercise complete dominion and control over the affairs" of a company are insufficient to pierce the corporate veil to impose liability and assert jurisdiction over the company.

The plaintiffs responded that the defendants were "all part of the same amalgamated enterprise, which has impermissibly competed with [Evapco] and used their proprietary documents and information in breach of legal obligations to [Evapco]." Evapco submitted that Maryland possessed jurisdiction over Mrs. Peterson because Evapco's "complain[t] flow[s] from the [SPA]," which Mrs. Peterson signed and thereby transacted business in Maryland by selling her stock in TCI to a Maryland company in Maryland through an SPA governed by Maryland law. In regard to the LLCs, Evapco charged, among other things, that "Mrs. Peterson, Evergreen[,] and [ACTP] are affiliates of Mr. Peterson and are bound by the forum selection clause in the [Confidentiality] Agreement; that Mr. Peterson is the agent and/or alter ego of Mrs. Peterson, Evergreen[,] and [ACTP]; and that Mrs. Peterson has transacted business in Maryland." Evapco urged that Maryland should not "countenance[]" the defendants' "shell game" and should enforce the Confidentiality Agreement against all defendants—even the non-signatories.

_____

[4] Mrs. Peterson testified in her deposition that she learned in November or December 2014 that Evapco had sued Mr. Peterson.

11

The circuit court held a hearing on October 2, 2015. At the hearing, Evapco presented, for the first time, out-of-jurisdiction cases that articulated and applied a doctrine that aligned with Evapco's theory of jurisdiction: a forum-selection clause can bind non-signatories to its jurisdiction and venue provisions if the non-signatories are found to be "closely related" to the contractual relationship. The circuit court took the matter under advisement, allowing the defendants time to respond in writing to Evapco's newly presented cases.

On October 27, 2015, the circuit court issued a memorandum opinion denying the motion to dismiss. The court began by recognizing that "the evidence is clear in this case that Mrs. Peterson was a resident of North Carolina at all times relevant[], that [ACTP] was organized in North Carolina, that Evergreen was organized in Georgia and conducted business principally in North Carolina, and that neither [ACTP] or Evergreen existed at the time of a sale of TCI." The court concluded that "there [wa]s sufficient basis . . . to exercise specific personal jurisdiction over them as to this action." In so ruling, the court found that the plaintiffs "ha[d] established minimum contact on the part of" Mrs. Peterson, ACTP, and Evergreen.

### 3. Defendants' Counsel's Motion to Withdraw Appearance

On February 10, 2016, the defendants' counsel filed a motion to withdraw their appearance and included copies of the notice that they sent to each of the defendants. Evapco consented to the motion but "request[ed] that the withdrawal of Defendants' counsel [] not delay or postpone the trial date."

One week later, on February 16, Evapco filed a third amended (and operative)

12

complaint. This complaint added a sixth, seventh, and eighth count: (6) fraud against Mr. Peterson, for allegedly failing to disclose his business activities in competition with Evapco; (7) aiding and abetting against Mrs. Peterson, ACTP, and Evergreen, alleging that Mrs. Peterson had actual knowledge of Mr. Peterson's tortious conduct and that she, together with ACTP and Evergreen, "provided substantial assistance, aid and encouragement in the commission and non-disclosure of" Mr. Peterson's competitive activities; and (8) breach of contract against Mr. Peterson based on fiduciary duties of loyalty and good faith, alleging that he had a duty to act for the benefit of Evapco but engaged in self-interested and self-dealing conduct.

The defendants, through new counsel, filed answers on March 7, 2016, again asserting general denials and several affirmative defenses.

### 4. Evapco's Motion for Sanctions

When the plaintiffs filed their third amended complaint, they also filed a motion for sanctions along with a supporting memorandum and two large binders evidencing their discovery efforts and the defendants' alleged spoliation. Evapco claimed the defendants willfully destroyed discoverable evidence that they were under a legal obligation to preserve. They asked the court to sanction the defendants by entering summary judgment as to liability and damages against all defendants jointly and severally. Evapco urged the court to treat the defendants as one amalgamated enterprise because each "had the right, authority, or practical ability to obtain all discoverable documents in this case[,]" and because the Petersons used Evergreen's bank account as a "slush fund" for ACTP and vice

13

versa.[5]   According to Evapco, the defendants' "meager document productions and evasive written responses" prompted the plaintiffs to "expand[] their third-party subpoena efforts[,]" which were excessively costly but led them to discover "the trail of destruction and the enormous scale of Defendants' operations[.]"

*Duty to Preserve*

Evapco posited that the defendants' duty to preserve began no later than Mr. Peterson's termination date, July 29, 2014.   Mr. Peterson's termination letter from TCI informed him that "TCI is considering initiating legal action against you to recover damages for the violations of the [] Agreement[,]" and an attached letter from TCI's counsel warned:

> [F]ederal and state law prohibit you from deleting, and require you to take affirmative steps to preserve, all Confidential Information and Work Product in your possession, custody or control.   This includes any documents, including emails, that concern Evapco or any other business that you conducted individually or on behalf of any other person or entity.   It is no excuse under the law to have deleted documents as a result of a routine or automatic document or email destruction policy.

Because Mr. Peterson's routine practice was to delete transaction records after two years, Evapco alleged that he should have maintained, at the least, any records dating back to July 29, 2012—two years prior to his termination.[6]

---

[5] Evapco also asked the court to consider "CA Peterson" or "CA Peterson Enterprises," an unincorporated business run by the Petersons, as part of the amalgamated business.   According to Evapco, the Petersons also conducted cooling tower business under these trade names.   Mr. Peterson testified in his deposition that the CA stood for both Charles A. and Carmen A.

[6] Alternatively, Evapco argued that Mr. Peterson should have anticipated litigation
*(Continued...)*

14

*Spoliated Emails*

Evapco alleged that the Petersons destroyed emails from at least four different email addresses that they used in connection with their cooling tower businesses. From his primary business email address, optigrid@aol.com, Mr. Peterson produced "only about 37 emails[,]" "of which 26 were from 2011, two were from 2012, and none were from the years 2013, 2014 and 2015." Four months later, he produced another 79 emails, but still did not include numerous responsive emails that Evapco recovered from third parties, including emails predating his termination. The emails that were produced by third parties included the defendants' purchases from Evapco's manufacturers and competitors, quotes for sales in competition with Evapco, and emails indicating Mr. Peterson represented TCI but urging customers to switch payment information to Evergreen. Third-party subpoenas also uncovered emails from optigrid@aol.com, including: requests to receive invoices and shipping documents from an order placed prior to Mr. Peterson's termination, bids and quotes that Mr. Peterson submitted to Evapco's competitor for TCI's products that he was not ordering from TCI, and emails directing future correspondence to be sent to optigrid@yahoo.com.

---

as early as 2012 when TCI re-hired the Petersons' son, contingent on Mrs. Peterson abandoning her plans to start a competing cooling tower parts company, ACTP. Mr. Peterson admitted during the North Carolina unemployment hearing that when Evapco found out that Mrs. Peterson and their son started ACTP, "we had a meeting and we worked out where if my son was rehired by [TCI] that they would not start this other company[.]" After this deal was reached, Evapco CEO, Mr. Bartley, emailed Mr. Peterson on December 5, 2012, that he heard rumors Mrs. Peterson was moving forward with her competing company regardless, and threatened that it was ultimately "for the attorneys and courts to decide."

In his responses to interrogatories, Mr. Peterson claimed that he did not begin using optigrid@yahoo.com until September 2014—over a month after his termination date. Yet third-party subpoenas uncovered an internal email from a cooling tower contractor sent *on* Mr. Peterson's termination date to a competing cooling tower company that read, "Augie – making sure this is working." During his deposition, Mr. Peterson claimed that Yahoo! informed him sometime before December 27, 2014, that the company accidentally lost his emails. The plaintiffs, however, managed to procure what they purported to be "hundreds of destroyed emails" that were sent from optigrid@yahoo.com to Evapco's competitors.[7] Mrs. Peterson revealed that she continued deleting emails *after receiving her subpoena* but claimed that she could not remember whether any would have been responsive: "I'm not – I'm not going to testify to that. I'm going to take it back if I said [they were not responsive]. I just delete. I delete-delete. Anything that's there that I don't want, don't need anymore, I delete."

*Spoliation of Other Records*

Evapco also cataloged the destruction of records from Mr. Peterson's laptops, the

---

[7] Evapco further alleged that the defendants failed to produce a single email from caluca50@yahoo.com or caponen15@yahoo.com. According to Mr. Peterson's interrogatory response, caluca50@yahoo.com was an address Mr. Peterson claimed he "rarely used." When Mr. Peterson was deposed about the lack of emails from this account, Mr. Peterson suggested that his wife may have deleted them and that he did not remember whether he ever deleted cooling tower related business from his email accounts. Yet, once again Evapco discovered responsive emails from caluca50@yahoo.com.

The defendants also did not produce a single email from caponen15@yahoo.com despite Mrs. Peterson's deposition testimony that it was ACTP's exclusive email address since 2012. Mrs. Peterson testified that she did not think any of those emails were responsive, but she did not review them, "[b]ecause they're not there anymore. I throw everything out. Whereas some people keep everything, I get rid of it."

Petersons' home desktop, and paper records. For most of these records, Evapco found either bank records without corresponding transactional records or vice versa. Evapco's damages expert estimated that, apart from the bank records, records supporting at least $3 million in transactions were still missing at the time the plaintiffs filed their motion for sanctions, such as "a $62,250.05 check for work on a project in California[]" for which "there is no record of where it was deposited."

Evapco sought summary judgment on liability and damages as a sanction based on evidence that (1) the defendants lost or intentionally destroyed documents well after litigation was imminent and even after suit was filed and (2) Evapco was prejudiced by the defendants' spoliations and the consequent absence of critical transactional documents.[8]

The defendants responded by accusing the plaintiffs of "using [their] abundant resources to litigate a former employee into submission[,]" and characterized the plaintiffs' memorandum in support of sanctions as "an excessively long motion with numerous document references and picayune details, mainly serving to establish the unremarkable fact that the Petersons are not good at details and record keeping." They argued that, prior to Mr. Peterson's termination from TCI, none of the defendants had reason to know or suspect that Evapco would sue. Although the termination letter may have triggered a duty to preserve, the defendants suggested that it applied only to documents from that date forward, not those dating back to 2012 as Evapco suggested. And the defendants

---

[8] Evapco also asked the court to seal certain portions of their memorandum supporting their sanctions motion as well as some of the exhibits that accompanied that memorandum.

17

contended that Mrs. Peterson "was not aware that she was likely to be added as a defendant in this case until the filing of the Second Amended Complaint, on May 30, 2015."

The defendants contended that there was insufficient evidence to support a finding that they deleted documents with intent to subvert discovery because (1) it was not their practice to save records or emails, (2) Mrs. Peterson made reasonable efforts to locate documents relating to ACTP, (3) her computer was damaged in a lightning storm, and (4) Mr. Peterson gave TCI complete access to all of the documents in his office and on his work computer at the time of his termination.[9]  Further, they urged, all evidentiary inferences should be decided in their favor as the non-moving party and argued that Evapco's motion required the court to weigh evidence and determine witness credibility— issues that should be decided by the jury.

The defendants pressed that the plaintiffs were not prejudiced because they were able to recover "a significant quantity of similar discovery from third parties." Additionally, the defendants challenged Evapco's right to summary judgment on damages based solely on Evapco's own, unsupported "expert" report.

In reply Evapco argued that, under *Cumberland Insurance Group v. Delmarva Power*, 226 Md. App. 691, *cert. denied*, 447 Md. 298 (2016), "the proscription against the [trial] court making findings of fact and credibility determinations that are applicable in the summary judgment context do not apply in the context of discovery sanction[s], even if

---

[9] Although the defendants' opposition brief admitted that TCI made a copy of Mr. Peterson's work laptop before deleting the computer's hard drive, they contended that TCI failed to make "a forensic image that would preserve any hidden or deleted files[,]" and claimed that the failure to do so made TCI "equally guilty" of spoliation.

one of the sanctions imposed is the entry of summary judgment against the spoliating party or parties."

*Sanctions Hearing and Order*

At a hearing on March 30, 2016, the court granted judgment in favor of Evapco on each count in the third amended complaint and granted their motion to partially seal the record. The court, however, denied Evapco's motion for injunctive relief and damages and ordered that an evidentiary hearing be set with respect to Evapco's requests for equitable relief and monetary damages. The court entered a written order to this effect on April 5.

**5. Other Procedural Matters**

On April 7, the court entered an order granting defense counsel's motion to withdraw appearance and mailed a notice to employ new counsel to each defendant.

Then, on April 12, Evapco filed a motion withdrawing their election for a jury trial, stating that Maryland Rule 2-433(a)(3) preserves the right to a jury trial only to the *plaintiffs* if the court holds a hearing on damages following a default judgment. Consequently, Evapco asked the court to modify the scheduling order to remove all deadlines related to a trial by jury and to schedule a hearing on damages.

The court requested a response from the defendants; the Petersons, now *pro se*, wrote to the court on April 14, "request[ing] confirmation that a Trial by Jury has been requested in this matter. If not previously requested, Defendants so request Trial by Jury and the Defendants do not waive their right to have a Trial by Jury." Four days later, the Petersons wrote the court again. This time they asked the court to vacate the order sealing items produced during discovery, arguing that "[t]o have a fair defense the Discovery

19

Material is needed[]to determine the damages that the Defendants are being charged with."

On April 22, the court modified the scheduling order to include "a hearing regarding damages and equitable relief" on May 2 and 3. The court also entered two orders denying the requests contained in the Petersons' April 14 and April 18 letters. The first order treated the Petersons' April 14 letter as a request for a jury trial and denied that request. The second order denied the Petersons' request to unseal discovery documents "because the case is currently in a Default posture against the moving party and the rules prevent the Court from entertaining a motion of this type."

### 6. Remedies Hearing

Mr. Peterson arrived at the remedies hearing on May 2 without Mrs. Peterson or an attorney. He had a doctor's note for his wife and informed the court simply that she was "was not able to come; she has a medical condition." The court told Mr. Peterson that he could represent himself but was not legally able to represent Mrs. Peterson. Evapco's counsel chimed in, asserting that ACTP and Evergreen could not legally appear at the hearing without counsel.

Mr. Peterson then proceeded by challenging the court's denial of his request for a jury trial and the denial of his request to unseal discovery material. He also challenged the court's earlier grant of his attorney's motion to withdraw without his consent and claimed that he "never got a lot of evidence" from his counsel. The court explained that the jury trial right is not available to Mr. Peterson under the Maryland Rules because he was in default. The court also refused to postpone the trial due to the alleged failure of Mr. Peterson's former counsel to provide evidence to him, noting that there was no motion

20

pending or any viable basis to postpone the hearing.

*Presentation of Evidence*

Over the next three days, the court heard evidence, beginning with testimony from Mr. Bartley about Evapco's general business structure, the purchase of TCI, and Mr. Peterson's tenure and termination. Evapco's counsel then read into the record transcripts from six depositions: (1) Mr. Robert Sawyer, the designated representative of Pacific Plastic Technology, Inc., a company that purchased Opti-Grid from Evergreen; (2) Mr. Philipe Reyna, the corporate designee for West Texas Cooling Towers, which sold Dat Industries machinery to make Opti-Bar and purchased Opti-Grid from C.A. Peterson; (3) Ms. Candace Rutherford, a sales person at United Plastic Recycling, which tested product-material samples for Mr. Peterson at TCI and then sold them to Evergreen and Dat Industries, (4) Ms. Tina Galloway Ortiz, a sales person at Gerard Daniel Wire Worldwide, which sold customized parts to Mr. Peterson at both Evergreen and Dat Industries, and testified that Mr. Peterson told her he had to purchase parts under "a different company named Dat" because "[his] former employer is being difficult[,]" and "[we]re not letting [him] sell in the cooling tower industry"; (5) Mr. Toby Carl Moala, who helped operate Dat Industries' manufacturing department; and (6) Mr. Towfique Habib and Mr. Vivia Ramiswami of Proplant, Inc., a Texas-based engineering procurement and construction company that sought advice on and products for cooling towers from Mr. Peterson at TCI and eventually from Evergreen.

The court heard live testimony from Mr. Colwell, General Manager of TCI, who explained TCI's business and operations, as well as his role supervising Mr. Peterson. Mr.

21

Walter Joseph Whalen, Vice President of Operations at EvapTech, also testified that EvapTech provided the same services Evergreen offered to Proplant. Mr. Michael Kresslein was accepted as a damages expert and testified that his "goal was to calculate what the plaintiffs would have earned if they had properly been referred these sales opportunities and had consummated them. So [depending on pricing] it may be the same as the profit that the defendants did earn on these sales but it may not be." Based on several categories of unauthorized transactions by the defendants and lost sales to Evapco, Mr. Kresslein estimated that the defendants caused Evapco about $3,000,000 in lost profits.

Mr. Peterson presented no evidence on his own behalf.

*Closing Statements*

Following the close of evidence on May 4, the parties gave closing remarks. Evapco argued that the evidence presented—particularly the defendants' hidden bank accounts and manufacturing operation in Texas—warranted an equitable two-year extension of the restrictive covenant. Regarding monetary damages, Evapco pointed out that Mr. Peterson failed to challenge much of their damages expert's testimony on cross-examination. The defendants couldn't complain about the unprecise nature of lost profits, Evapco averred, because their own spoliation made precision impossible. Evapco then urged the court to grant punitive damages based, in part, on the Dat Industries fraudulent production of TCI products that Evergreen used to outbid TCI on a project Mr. Peterson was supposed to be working to secure for TCI.

In his summation, Mr. Peterson argued that he had no control over Dat Industries: "[M]y name isn't on anything. No payments were ever made to me. So, a lot of that I just

22

have no control over." He then contended that "a lot of" the damages Evapco alleged were assumptions and that they "never proved that certain things happened, or certain things were done."

*The Court's Ruling*

In an order entered on May 23, 2016, the court reiterated that it had previously determined that it had personal jurisdiction over Mrs. Peterson, Evergreen, and ACTP based on "minimum contacts" following oral argument on defendants' motion to dismiss, which was fully briefed by competent counsel. The court also recapped its finding against the defendants, jointly and severally, on all counts of the third amended complaint as a sanction for "their willful spoliation of discoverable documents." The court then entered a final judgment denying Evapco's request for injunctive relief (reasoning that it would be duplicative to award both injunctive relief and damages for the same period) and awarding Evapco $2,187,104 in total compensatory damages. The court found that the evidence presented—including the defendants' manufacturing operation with Dat Industries and sales to Proplant—established "that Defendants' actions were motivated by actual malice toward the Plaintiffs, such that the Defendants acted with evil motive, intent to injure, ill will, and/or fraud." Accordingly, the court awarded Evapco an additional $993,950 in punitive damages, bringing the total award to $3,181,054. Finally, the court awarded attorneys' fees to Evapco, concluding that the defendants "willfully and maliciously violated the [NCTSA]" and that "there was unwarranted refusal by Defendants to resolve fully the matter which constitutes . . . the bases of the suit[.]"

*Motion for Reconsideration and Appeal*

Evapco filed a motion for reconsideration on June 2, 2016, asking the court to reconsider its denial of injunctive relief. The defendants, once again represented by counsel, responded and asked the court to deny the motion. They noted their appeal on June 16. The circuit court denied Evapco's motion for reconsideration in an order entered on June 24. Appellants present the following five issues in their opening brief:

1. "Did the Circuit Court err when it denied Appellants Carmen Peterson, Evergreen, and ACTP's Motion to Dismiss for lack of personal jurisdiction when those Defendants performed no business in and lacked minimum contacts with Maryland?"

2. "Did the Circuit Court err when it entered a discovery sanction depriving Appellants of their constitutional right to present evidence in their defense with respect to liability when the documents at[]issue were on computers Appellee seized at the time it terminated Appellant Charles A Peterson?"

3. "Did the Circuit Court err when it refused to provide a jury trial despite the fact that Appellants had timely demanded a jury?"

4. "Did the Circuit Court err in denying Mr. Peterson's motion for a continuation of the trial because his wife, who was also a defendant in the case, was ill and because Appellants needed additional time to obtain new counsel?"

5. "Did the Circuit Court err in refusing to allow Mr. Peterson to present evidence to rebut Appellee's inflated damages claim because the evidence he wished to offer were business records of Evergreen and ACTP who he did not represent?"

## DISCUSSION

## I.

### Personal Jurisdiction

Appellants assign error to the circuit court's exercise of personal jurisdiction over Mrs. Peterson, Evergreen, and ACTP. They reiterate most of the arguments raised below and maintain that Mrs. Peterson has no connection to Maryland other than the sale of TCI in 2005, which Appellants agree, was pursuant to the SPA governed by Maryland law. They contend that Mrs. Peterson's conduct does not fall within the purview of Maryland's long-arm statute, Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 6-103 and that Maryland's exercise of personal jurisdiction would offend the Due Process Clause of the Fourteenth Amendment.

Appellants insist that neither ACTP nor Evergreen has engaged in any meaningful conduct in this State and that, even if Mr. Peterson did act as their agent, he did not act as their agent in Maryland. They note that the acts on which Appellees rely—"Mr. Peterson signing a document as an officer of [ACTP], Mr. Peterson signing an [ACTP] check for an Evergreen invoice, Mr. Peterson signing an Evergreen check made out to [ACTP], and Mr. Peterson transitioning work from Evergreen to [ACTP]"—occurred in North Carolina. Otherwise, Appellants suggest that Evapco's only argument is that Evergreen and ACTP are somehow bound by the forum-selection clause in the Confidentiality Agreement, but that Appellees fail to "point to any language in the forum selection clause that would suggest anyone other than Mr. Peterson was intended to be bound."

Appellees counter that we need not consider Maryland's long-arm statute or the

corresponding Fourteenth Amendment analysis because Mrs. Peterson, Evergreen, and ACTP are all closely related to Mr. Peterson and the transactions that violated the Confidentiality Agreement—meaning they are bound by the forum-selection clause that Mr. Peterson signed.[10] To demonstrate this close relationship, Appellees note that "[t]he Petersons jointly established, owned, controlled, and operated, from their family home, various enterprises [including Evergreen and ACTP] engaging in cooling tower transactions that [Mr.] Peterson's Agreement prohibited, from which all [Appellants]

_____

[10] Appellees argue in the alternative that, even if we do not adopt the closely related doctrine, Appellants had sufficient minimum contacts in Maryland to support the circuit court's exercise of personal jurisdiction over them. With respect to Mrs. Peterson, they suggest her forum contacts "aris[e] out of th[e] transaction" that closed in Maryland through which she sold her stock in TCI to EvapProducts, a Maryland company, pursuant to the SPA, which referred to the Confidentiality Agreement. Appellees further allege that ACTP and Evergreen are Mr. Peterson's agents or alter ego.

In a recent case in which we examined the reach of Maryland's long-arm statute, we held that a parent corporation's creation of a merger subsidiary in Maryland did not amount to minimum contacts within the forum sufficient to confer personal jurisdiction over the parent corporation. *Stisser v. SP Bancorp, Inc.* 234 Md. App. 593, 639-40 (2017). We reasoned that, through the filing of articles of merger in Maryland, the parent company did not intend to establish continuing obligations in this forum, and the filing "was—at best—only tangentially related" to the underlying claims that arose out of the subsequent merger. *Id.* at 640 ("It is not the mere filing of a legal instrument in Maryland that gives rise to specific jurisdiction, but the execution of an instrument that is fraudulent or causes a tortious injury within Maryland."). If we were called upon to apply the principles discussed in *Stisser* to the instant case, it is doubtful that Mrs. Peterson's singular act of signing the SPA would suffice to confer jurisdiction over her in Maryland in a suit arising out of the Confidentiality Agreement. *Cf. Cappel v. Riaso*, 197 Md. App. 347, 364 n.4 (2011) (declining to reach the plaintiff's forum-selection argument). Also, whether or not Mrs. Peterson's actions outside of Maryland "[c]ause[d] tortious injury in the State . . . by an act or omission outside of the State" within the meaning of CJP § 6-103(b)(4) is an issue that was not argued or developed below or on appeal. In any case, we need not consider whether Mrs. Peterson, Evergreen, or ACTP had sufficient forum contacts in Maryland because we hold that Maryland has personal jurisdiction over them by virtue of their close relationship to the Confidentiality Agreement and its forum-selection clause.

26

benefited." Moreover, Mrs. Peterson signed the SPA, which explicitly referenced the Confidentiality Agreement, so she should have been fully aware that it included a forum-selection clause. Appellees concede that whether third parties can be bound by the contracts of another with whom they are "closely related" is an issue of first impression in Maryland.

Appellants reply that even in those states that apply the "closely related" approach to assert jurisdiction based on a forum-selection clause, it is not enough that the non-signatory is the signatory's spouse. According to Appellants, the clause must be "clearly and directly communicated" to the non-signatory so that it is foreseeable that he or she will be bound. They argue that Evapco produced no evidence that the forum-selection clause was communicated to Mrs. Peterson or that she was ever aware of it before the second amended complaint. Additionally, if Appellees intended Mrs. Peterson to be bound by the same non-compete and forum-selection clause as her husband, "they had every opportunity" to include it in the SPA or to have Mrs. Peterson sign a separate contract as they had her husband do. Appellants reiterate that ACTP did not have the requisite relationship with Mr. Peterson. They also argue that Evergreen could not have expected to be bound by the Agreement's forum-selection clause because, like ACTP, it was not a party and, additionally, all the transactions in which Evergreen engaged with TCI's customers were open and "collaboratively billed" with Evapco.

### 1. Jurisdiction by Consent

The circuit court seemed to base its ruling on a minimum contacts theory of personal jurisdiction—stating that the plaintiffs "established minimum contact" on the part of Mrs.

Peterson, ACTP, and Evergreen. That rationale does not confine us, however, because we view determinations of personal jurisdiction *de novo*. *CSR, Ltd. v. Taylor*, 411 Md. 457, 472 (2009) (citations omitted). We apply the same standard of review to the enforceability of a forum-selection clause. *See Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1104 (6th Cir. 1997); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 207 (7th Cir. 1993).

We recently addressed the circumstances under which Maryland may assert personal jurisdiction—specifically or generally—over non-resident corporations and their non-resident officers based on their contacts in Maryland under the constitutional minimum contacts test. *See Stisser v. SP Bancorp, Inc.*, 234 Md. App. 593 (2017). To resolve the instant dispute, however, we need not reach those considerations. Maryland may also assert personal jurisdiction over non-resident corporations and their officers based on the non-residents' consent to personal jurisdiction in Maryland. *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 668 (D. Md. 2009) (citing *Heller Fin. Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1290 (7th Cir. 1989)). The Supreme Court has ruled that personal jurisdiction is a waivable right and one of the ways by which a party may waive its right is its "express or *implied* consent to personal jurisdiction of the court." *Ins. Corp. of Ire. v. Compagnie de Bauxites de Guinee*, 456 U.S. 694, 703 (1985) (emphasis added); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). Similarly, this Court has ruled that non-resident parties may consent to personal jurisdiction in Maryland through forum-selection clauses. *Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 483 (2012).[11]

---

[11] *See also Sköld v. Galderma Labs., L.P.*, 99 F. Supp. 3d 585, 609 (E.D. Pa. 2015) *(Continued...)*

The Court of Appeals, in adopting the federal standard for analyzing the enforceability of forum-selection clauses, explained,

> (1) a forum-selection clause is presumptively valid and enforceable and the party resisting it has the burden of demonstrating that it is unreasonable, (2) a court may deny enforcement of such a clause upon a clear showing that, in the particular circumstance, enforcement would be unreasonable, and (3) the clause may be found to be unreasonable if (i) it was induced by fraud or overreaching, (ii) the contractually selected forum is so unfair and inconvenient as, for all practical purposes, to deprive the plaintiff of a remedy or of its day in court, or (iii) enforcement would contravene a strong public policy of the State where the action is filed.

*Gilman v. Wheat, First Sec., Inc.*, 345 Md. 361, 378-79 (1997) (cataloging federal court decisions applying the same standard as well as decisions in accord from the state courts of Illinois, Kansas, and New Jersey). "The prevailing view in this country is that forum-selection clauses are presumptively enforceable." *Secure Fin. Serv., Inc. v. Popular Leasing USA, Inc.*, 391 Md. 274, 282-83 (2006) (collecting cases).

## 2. The Closely Related Doctrine

Courts throughout the United States have held that a non-signatory to a contract may nonetheless be bound by that contract's forum-selection clause if the non-signatory is so "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Hugel*, 999 F.2d at 209 (citing *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) (other citation omitted)); *see also Synthes, Inc. v. Emerge Med., Inc.*, 887 F. Supp. 2d 598, 607 (E.D. Pa. 2012) ("'It is widely accepted that non-signatory third-

---

(holding that it would "utterly defeat the purpose of forum selection clauses" to "mandat[e] that a plaintiff meet the constitutional minimum contacts test for personal jurisdiction as a prerequisite to enforcement of a forum selection clause").

parties who are closely related to [a] contractual relationship are bound by forum selection clauses contained in contracts underlying the relevant contractual relationship.'" (citations omitted)). The United States District Court for the Eastern District of Pennsylvania collected over a dozen cases from various federal courts that applied the closely related doctrine and distilled the following principle of law: "[T]he close business relationships between the signatories and non-signatories to the pertinent agreements, together with the fact that the dispute among the parties centered on the interpretation of the agreements, provided a sufficient basis on which to apply the forum selection clauses to the non-signatory." *Synthes*, 887 F. Supp. 2d at 610. One rationale for the closely related doctrine, as articulated by the Seventh Circuit, is that "[w]ere it not for judicial willingness in appropriate circumstances to enforce forum selection clauses against affiliates of signatories, such clauses often could easily be evaded." *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 441 (7th Cir. 2012). For example, "a signatory of a contract containing such a clause might shift the business to which the contract pertained to a corporate affiliate—perhaps one created for the very purpose of providing a new home for the business—thereby nullifying the clause." *Id.*

The closely related doctrine developed in the federal courts as a matter of federal common law. *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 407 n.11 (3d Cir. 2017). The United States Court of Appeals for the Seventh Circuit was one of the first courts to employ the "closely related" nomenclature. In *Hugel*, the court of appeals held that two companies, GCM and OMI, were closely related to a dispute arising out of a member agreement between Lloyd's of London and Dieter Hugel, who was the President and

30

Chairman of GCM and OMI and owned 99% of GCM and 100% of OMI. 999 F.2d at 209-10. Hugel was an individual underwriting investor in Lloyd's insurance market, and Lloyd's had suspected that Hugel violated his member agreement through criminal misconduct in concert with GCM and OMI. *Id.* at 207. After an investigation uncovered no wrongdoing, Hugel, GCM, and OMI sued Lloyd's in a federal district court seated in Illinois, alleging that Lloyd's disclosed confidential information from its investigation to the detriment of GCM and OMI's businesses. *Id.* The district court dismissed the suit based on a forum-selection clause in Hugel's member agreement, which provided that "'the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's[.]'" *Id.* at 208 (emphasis omitted). After concluding that the claims arose out of the membership agreement, the Seventh Circuit affirmed. *Id.* at 209-11. That court reasoned, "[a]lthough GCM and OMI were not members of Lloyd's, in the course of a dispute between Hugel and Lloyd's, Hugel alone involved his two controlled corporations and supplied information allegedly belonging to those corporations." *Id.* at 210. Based on this, the Seventh Circuit saw no error in concluding "that the corporations owned and controlled by Hugel are so closely related to the dispute that they are equally bound by the forum selection clause and must sue in the same court in which Hugel agreed to sue."[12] *Id.*

---

[12] The Eleventh Circuit applied a similar approach in *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998) (citing *Hugel*, 999 F.2d at 209). In another dispute involving Lloyd's of London, the Eleventh Circuit held that the spouses of *(Continued...)*

The Second Circuit adopted the closely related doctrine in *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 722-23 (2d Cir. 2013). Magi XXI, Inc., a New York corporation, was a sublicensee to a merchandise licensing agreement between Second Renaissance, LLC, a California company, and the Vatican Office of Publications, an agent for the Vatican State (the territory over which the Holy See of the Roman Catholic Church exercises sovereignty). *Id.* at 718. The Vatican Office of Publications has authority to license the right to make reproductions and adaptations of the artwork and artifacts in the Vatican Library collection. *Id.* at 718-19. Under the master license agreement, the Vatican granted Second Renaissance the rights to produce and market specific lines of products. *Id.* Magi sued Second Renaissance, the President of Second Renaissance, and the Vatican

two applicants for membership (referred to as "Names") were closely related to their spouses' contract with Lloyd's, and thus bound by the forum-selection clauses, because "the interests of the spouses in this dispute [we]re completely derivative of those of the Name plaintiffs—and thus 'directly related to, if not predicated upon' the interests of the Name plaintiffs[.]" *Id.* (quoting *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297 (3d Cir. 1996)). The Sixth, Eighth, and Ninth Circuits have also applied the closely related doctrine. *See Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757-58 (8th Cir. 2001) (holding that an individual plaintiff who was a shareholder, officer, and director at Marano was, "without question, 'closely related' to the disputes arising out of [Marano's] agreements and properly bound by the forum-selection provisions" (citation omitted)); *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1106 (6th Cir. 1997) (applying the closely related analysis to determine that parties were not closely related and thus, could not enforce the forum-selection clause); *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) (noting that non-parties to a contract may also benefit from and be bound by a forum-selection clause and agreeing "that the alleged conduct of the non-parties [to the contract] is so closely related to the contractual relationship that the forum selection clause applies to all defendants"). *See also Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 679 (4th Cir. 2018) (rejecting the defendant's argument that its *conduct* must be closely related to the contractual dispute as "too narrow a view of the circumstances under which a non-signatory may be bound by the terms of a contract executed by a third party[,]" but remanding the case for further discovery and fact finding).

State in a federal district court seated in New York. *Id.* at 719. Magi alleged that Second Renaissance did not allow access to Vatican artwork as their sublicense agreement represented, that the Vatican State was aware of this, and that Second Renaissance and its president acted as agents for the Vatican State. *Id.* Both the master agreement and the sublicensing agreement between Magi and Second Renaissance included forum-selection clauses selecting the State of Vatican City as the forum in which to resolve any disputes arising out of the agreements. *Id.* at 718. The district court granted the Vatican State's motion to dismiss based on the forum-selection clause in the Vatican's sublicense agreements, finding that the Vatican State was a closely related party and that it was foreseeable that the Vatican State would enforce the forum-selection clause against Magi. *Id.* at 720.

Magi appealed to the Second Circuit, which began its analysis by stating that a party's status as a non-signatory to an agreement does not automatically preclude it from enforcing a forum-selection clause in an agreement. *Id.* at 722. Relying on Seventh Circuit precedent, the Court reasoned that "'[a] literal approach to interpreting forum selection clauses—an approach that always ignored affiliates of the signatories—could . . . undermine the contribution that such clauses have been praised for making to certainty in commercial transactions.'" *Id.* (quoting *Adams*, 702 F.3d at 441). Because forum-selection clauses further judicial economy and promote uniform results, the court opined that "'where the alleged conduct of the nonparties is closely related to the contractual relationship, a range of transaction participants, parties and nonparties, should benefit from and be subject to forum selection clauses.'" *Id.* (quoting *Holland Am. Line Inc. v. Wärtsilä*

33

*N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007)). Thus, the Second Circuit ruled, "a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory[,]" so long as the relationship between the signatory and non-signatory is such that the enforcement of the forum-selection clause is "'foreseeable.'" *Id.* at 723 (quoting *Hugel*, 999 F.2d at 209). The court went on to affirm the district court's dismissal of the Vatican State, reasoning that it was a closely related party: "[T]he Vatican State was known by Magi as the source of the contractual authority granted to Magi by the Sublicense Agreements. The Sublicense Agreements also specifically provided for the extensive and continuing involvement of the Vatican State in the execution of Magi's obligations and authority under the Sublicense Agreements." *Id.* at 724.

In Maryland, the federal district court has applied the closely related doctrine in two reported decisions. In *Belfiore v. Summit Federal Credit Union*, the court held that a debt collection agency that acted as an agent for its co-defendant, the credit union, was "unquestionably covered by the choice of forum clause in the contract of the principal." 452 F. Supp. 2d 629, 633 (D. Md. 2006). Then, in *TECH USA, Inc. v. Evans*, the court held that a company, PSI, was closely related to an agreement between its sole shareholder (Evans) and TECH USA and thereby bound by the forum-selection clause in that agreement. 592 F. Supp. 2d 852, 858 (D. Md. 2009). TECH USA had sought to purchase Evans's staffing agency, PSI, but instead hired Evans as a Vice President based on the explicit understanding that he would use PSI's contacts to grow the staffing portion of TECH USA's business. *Id.* at 854-55. After TECH USA fired Evans, it sued Evans and

34

PSI for violating Evans's non-compete agreement. *Id.* at 855. The district court applied

the forum-selection clause against both defendants, reasoning that it was foreseeable that

PSI was so closely related that it would also be bound by the terms of Evans's agreement

with TECH USA. *Id.* at 858.[13]

---

[13] Outside of the federal circuits that have expressly adopted the closely related doctrine, district courts in the following federal districts have also applied the doctrine in reported opinions. *Deese-Laurent v. Real Liquidity, Inc.*, ___ F. Supp. 3d ___, ___, No. CV 17-10867-RWZ, 2018 WL 1610540, at *5 (D. Mass. Mar. 30, 2018); *Sagittarius Sporting Goods Co., Ltd v. LG Sourcing, Inc.*, 162 F. Supp. 3d 531, 538 (D.S.C. 2016); *Sabre Int'l Sec. v. Torres Advanced Enter. Sols.*, 60 F. Supp. 3d 21, 33-34 (D.D.C. 2014); *Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 585 (W.D. Tex. 2014); *Medtronic, Inc. v. Endologiz, Inc.*, 530 F. Supp. 2d 1054, 1056 (D. Minn. 2008); *D.I.P.R. Mfg., Inc. v. Perry Ellis Int'l, Inc.*, 472 F. Supp. 2d 151, 154 (D.P.R. 2007); *Allianz Ins. Co. of Can. v. Cho Yang Shipping Co.*, 131 F. Supp. 2d 787, 791 (E.D. Va. 2000). *But cf. Presbyterian Healthcare Servs. v. Goldman, Sachs & Co.*, 122 F. Supp. 3d 1157, 1212 (D.N.M. 2015) (declining, on the facts of the case, to apply the closely related doctrine to bind a state-created instrumentality by a forum-selection clause in a contract it did not sign); *Quicksilver Res., Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 954 (S.D. Tex. 2011) (holding that the closely related cases were inapposite based on the facts of the case at issue); *Trans. All. Bank, Inc. v. Arrow Trucking Co.*, 766 F. Supp. 2d 1188, 1198 (N.D. Okla. 2011) (same); *Millennium Petrochemicals, Inc. v. C.G. Jago*, 50 F. Supp. 2d 654, 658 (W.D. Ky. 1999) (same). *Cf. Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F. Supp. 2d 550, 556-57 (N.D. Tex. 2009) (rejecting the closely related test to apply a "more strict" third-party beneficiary doctrine but ultimately holding that the non-signatory defendant consented to jurisdiction because he was the agreement's intended beneficiary).

In state courts, California, Illinois, Minnesota, New York, Ohio, and West Virginia have adopted the closely related doctrine. *Lu v. Dryclean-U.S.A. of Cal., Inc.*, 11 Cal. App. 4th 1490, 1494 (1992) (enforcing a forum-selection clause against a closely related non-signatory because "[t]o hold otherwise would be to permit a plaintiff to sidestep a valid forum selection clause simply by naming a closely related party who did not sign the clause a defendant"); *Solargenix Energy, LLC v. Acciona, S.A.*, 17 N.E.3d 171, 185-86 (Ill. App. Ct. 2014) ("A nonsignatory impliedly consents to the forum selection clause via its connections with [the] dispute, the parties, and the contract or contracts at issue."); *C.H. Robinson Worldwide, Inc. v. FLS Transp., Inc.*, 772 N.W.2d 528, 536 (Minn. Ct. App. 2009) (applying the closely related doctrine to find personal jurisdiction over non-signatories that "[we]re 'closely related to the dispute such that it becomes foreseeable' that they would be bound by the clauses" (citation omitted)); *Univ. Inv. Adv. SA v. Bakrie (Continued...)*

35

In *Magi* and *Hugel*, the courts applied the closely related doctrine to impute the non-signatory plaintiffs' consent to venue under the forum-selection clauses at issue in those cases. *Magi*, 714 F.3d at 722, *Hugel*, 999 F.2d at 206. However, the doctrine applies equally to non-signatory, non-residents in the context of motions to dismiss for lack of personal jurisdiction. *See, e.g.*, *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 323-24 (S.D.N.Y. 2017) (addressing a motion to dismiss *for lack of personal jurisdiction* and citing *Magi* for the principle that, in the Second Circuit, "[i]t is well established . . . that a non-signatory may enforce a forum selection clause against a

*Telecom PTE, Ltd.*, 154 A.D.3d 171, 178-79 (N.Y. App. Div. 2017) (ruling that personal jurisdiction exists based on the closely related doctrine when "the nonsignatory party has an ownership interest or a direct or indirect controlling interest in the signing party or, the entities or individuals consulted with each other regarding decisions and were intimately involved in the decision-making process"); *Keehan Tenn. Invest., L.L.C. v. Praetorium Secured Fund I, L.P.*, 71 N.E.3d 325, 334 (Ohio Ct. App. 2016) ("Under the totality of the circumstances, we find it was foreseeable to the non-signatory plaintiffs that they would become involved in the contractual dispute[.]"); *Caperton v. A.T. Massey Coal Co.*, 223 W.Va. 624, 648 (2008), *rev'd on other grounds*, 556 U.S. 868 (2009) (holding "that a defendant who is a non-signatory to a contract containing a forum-selection clause may enforce that clause when it is shown that the claims against him or her are closely related to the contract).

Texas and Mississippi have asserted jurisdiction over non-signatories based on a different but similar approach. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 444 (Tex. 2017), *reh'g denied* (Sept. 22, 2017) (noting that Texas applies a "transaction participant" approach, which is similar to the closely related doctrine—a transaction participant includes "an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum"); *see also Titan Indem. Co. v. Hood*, 895 So.2d 138, 149 (Miss. 2004) (applying a "transaction participants" test like that in Texas to enforce a forum-selection clause against two non-signatories: a former corporate officer and his new company).

Wyoming, however, refused to apply the closely related doctrine. *See Venard v. Jackson Hole Paragliding, LLC*, 292 P.3d 165, 173 (Wyo. 2013) (declining to apply the closely related doctrine to defendants who had signed the same contract with a membership association as the plaintiffs when the dispute did not arise out of that contract).

signatory where the non-signatory is 'closely related' to a signatory[,]" but holding that the non-signatory was *not* closely related); *Discover Prop. & Cas. Ins. Co. v. TETCO, Inc.*, 932 F. Supp. 2d 304, 309-10 (D. Conn. 2013) (relying on *Magi* to find TETCO, the defendant, was closely related and subject to personal jurisdiction based on a forum-selection clause because "it should have been foreseeable to TETCO that Discover . . . might seek to enforce the clauses [against it]); *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 485-86 (W.D.N.Y. 1997) (relying on *Hugel* and *Manetti-Farrow* to find personal jurisdiction over a non-signatory defendant).

The Illinois Appellate Court, for instance, asserted personal jurisdiction over closely related defendants in *Solargenix Energy LLC v. Acciona SA*, 17 N.E.3d 171 (Ill. App. Ct. 2014). Solargenix, a North Carolina LLC, entered into a joint venture with Acciona North America ("ANA"), a Delaware corporation located principally in Illinois, which was the wholly-owned subsidiary of a Spanish corporation, which, in turn, was the wholly-owned subsidiary of a second Spanish corporation. *Id.* at 174. The joint venture agreement included a forum-selection clause through which Solargenix and ANA "consent[ed] to the exclusive jurisdiction of any state or federal court" in Chicago and "waive[d] any objection based on lack of personal jurisdiction, improper venue or *forum non conveniens*[.]" *Id.* at 177. When a dispute arose out of the agreement, Solargenix sued ANA as well as the two Spanish parent-companies in Illinois state court. *Id.* at 175. The non-signatory parent-companies moved to dismiss for lack of personal jurisdiction. *Id.* at 178.

After analyzing several decisions that applied the closely related doctrine to exercise personal jurisdiction over non-signatories, the Appellate Court announced:

> The touchstone illustrated by these cases is that a court may exercise personal jurisdiction over a defendant by enforcing a forum selection clause against it, even though it was not a signatory to the contract containing the clause, where it was closely related to the dispute such that it became foreseeable that the non-signatory would be bound, regardless of whether the non-signatory is a defendant or plaintiff in the subject litigation.

*Id.* at 185. It reasoned that when "there is a sufficiently close relationship between the non-signatory and the dispute and the parties, it does not defy the non-signatory's reasonable expectations that it would be bound by the clause, just as the signatory parties are." *Id.* Thus, based on the forum-selection clause, the Appellate Court concluded that "the present dispute f[ell] within its scope[,]" and held that "the parties consented to jurisdiction in Illinois." *Id.*; *see also Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp.*, 875 F. Supp. 2d 297, 306 (S.D.N.Y. 2012) (finding personal jurisdiction existed based on the closely related doctrine and opining that "[c]ontractual consent to jurisdiction, through forum selection clauses, '*obviates the need for a separate analysis of the constitutional propriety of exercising personal jurisdiction.*'" (citation and brackets omitted) (emphasis added)). *But see Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 927-28 (N.D. Ill. 2017) (rejecting the plaintiff's assertion that personal jurisdiction existed over a non-signatory based on the closely related doctrine when there was "no evidence of corporate affiliation, mutuality, or any of the other types of relationships discussed in the case law." (footnote omitted)); *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 933-34 (D. Minn. 2016) (declining "to apply the closely-related doctrine to bind an out-of-state new employer to state court based on a contract to which it was not a party and where it did not voluntarily join the contracting employee in any litigation").

In similar circumstances to those in the present appeal, the Eastern District of Pennsylvania held that a spouse was subject to personal jurisdiction based on her close relationship to an agreement that contained a forum-selection clause that her husband signed. *AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 700 (E.D. Pa. 2014). AAMCO, a Pennsylvania corporation, entered into a franchise agreement with Robert Romano, a Florida resident, allowing him to operate a vehicle repair center under the AAMCO name. *Id.* at 704. His wife, Linda, acted as an agent of the business. *Id.* AAMCO distributed proprietary systems and materials to Mr. Romano and disclosed trade secrets for operating the business. *Id.* The franchise agreement was set for a term of 15 years and prohibited Mr. Romano from engaging in a transmission repair business within 10 miles of his former franchise or any other AAMCO center for two years following the Agreement's termination. *Id.* at 704-05. The agreement included a forum-selection clause specifying that disputes would be brought in certain Pennsylvania state courts and/or the Eastern District of Pennsylvania. *Id.* at 705. The parties mutually terminated the agreement on February 20, 2013 (which had been renewed August 2007); AAMCO released Mr. Romano from most provisions but extended the obligations of the non-compete. *Id.* But the Romanos began operating a transmission repair business roughly 100 miles north of the location of their AAMCO business but 1.5 miles from the nearest AAMCO. *Id.*

AAMCO sued the Romanos, alleging that they breached the non-compete. *Id.* at 703. The Romanos moved, *inter alia*, to dismiss for lack of personal jurisdiction and improper venue, and they disputed the applicability of the forum-selection clause. *Id.* at

39

705-06. They asserted that Ms. Romano "has never been in any contractual relationship with AAMCO and thus is not subject to any forum selection clause." *Id.* at 706.

After determining that the forum-selection clause continued to apply after the agreement's termination, *id.* at 707-08, the court considered whether the clause applied to Ms. Romano because she did not sign the agreement. *Id.* at 708. The court noted cases—both within the Third Circuit and other circuits—enforcing forum-selection clauses against non-signatories under the closely related doctrine. *Id.* The Court stated, "[g]iven her spousal relationship with [Mr.] Romano," *id.* at 709 (footnote omitted), and the fact that she was the owner of the new transmission business, "she is a third-party beneficiary of the knowledge and experience that [he] gained in the course of his [] relationship with AAMCO." *Id.* As such, Ms. Romano was held bound by the forum-selection clause, and the court denied the motions to dismiss for lack of personal jurisdiction and improper venue. *Id.*; *see also Cajun Glob. LLC v. Swati Enters., Inc.*, 283 F. Supp. 3d 1325, 1331 (N.D. Ga. 2017) (denying an individual defendant's motion to dismiss for lack of jurisdiction because he "[wa]s so closely related to this dispute that it was foreseeable that he would be bound by the . . . personal jurisdiction and forum selection clause"); *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F. Supp. 3d 816, 823 (N.D. Cal. 2015) (holding that personal jurisdiction existed over an individual defendant for claims relating to a forum-selection clause of an agreement to which he was closely related, and noting that "[w]ith one exception, every district court in [the 9th] circuit that has considered whether to apply a forum-selection clause to a corporate officer or related company that was not part of the agreement to which it applies in his or her individual capacity has

40

enforced that forum-selection clause, provided the claims in the suit related to the contractual relationship").

In 2015, the Third Circuit adopted a three-prong test to ascertain whether the closely related doctrine bound non-signatories to a forum-selection clause contained in a subscription agreement.[14] *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214 (3d Cir. 2015). The plaintiffs in that case were Carlyle, two LLCs affiliated with it, three founders and officers, and three former directors of CCC, an affiliated corporation that invested in mortgage-backed securities. *Id.* at 216. They sued Mr. Louis Reijtenbagh; three entities he owned and controlled, Moonmouth, Plaza, and Parbold; and an affiliated Dutch company in Delaware Chancery Court pursuant to a forum-selection clause in a subscription agreement between CCC and Moonmouth. *Id*. at 216. Following the financial crisis of 2008 and CCC's subsequent liquidation, Reijtenbagh sought to off-load Carlyle-affiliated funds that he held, executing seven transfer agreements between Bundora (another affiliated investment entity that Reijtenbagh owned), several Carlyle affiliates, and third-party purchasers. *Id.* Each transfer agreement contained a forum-selection clause and a release under which Bundora waived all then-existing claims against Carlyle and its affiliates. *Id.* After Reijtenbagh, Moonmouth, Plaza, and Parbold sent a letter to the

---

[14] In articulating the three-part test, the Third Circuit cited several Delaware cases in which the courts applied the closely related doctrine to exercise personal jurisdiction over non-signatory defendants who had filed motions to dismiss. *See also Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 629 (D. Del. 2015) (applying the three elements of Delaware's closely related test to determine whether personal jurisdiction existed over a non-signatory, non-resident defendant based on that party's close relationship to a contract containing a forum-selection clause).

plaintiffs alleging that they took irresponsible risks with investments CCC managed, the plaintiffs sued in Delaware to enforce the Subscription Agreement's forum-selection clause and the liability releases from the transfer agreements. *Id.* Plaza removed the case to federal court, which then granted the plaintiffs' motion to remand to state court. *Id.* Plaza appealed, contending, among other things, that the plaintiffs lacked standing to invoke the forum-selection clause because they were not parties to the subscription agreement. *Id.* at 219.

The Third Circuit articulated the approach that Delaware courts apply to determine whether to assert jurisdiction over a non-signatory to a forum-selection clause: "(1) is the forum selection clause valid, (2) is the non-signatory a third-party beneficiary of the agreement or closely related to the agreement, and (3) does the claim at hand arise from the non-signatory's status related to the agreement?" *Id.* at 218 (citing *Baker v. Impact Holding, Inc.* 2010 WL 1931032, at \*3 (Del. Ch. May 13, 2010) (unpublished) (other citations omitted)). The court noted that forum-selection clauses are presumed to be valid unless the party challenging the clause clearly establishes that it is invalid, or its enforcement would be unreasonable or unjust—a standard Plaza had not met. *Id.* at 218-19. Moving on to the second factor, the Third Circuit noted that, "[i]n determining whether a non-signatory is closely related to a contract, courts consider the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *Id.* at 219 (citations omitted). The court determined that the following facts indicated that Plaza was closely related to the Subscription Agreement:

> Plaza was Moonmouth's director and it executed the Subscription Agreement on Moonmouth's behalf. Plaza and Moonmouth are affiliated entities that are both owned and controlled by Reijtenbagh. Several provisions of the Subscription Agreement itself indicate the close relationship between Moonmouth, Plaza, and Reijtenbagh. Reijtenbagh is listed as Moonmouth's primary contact person and his address includes "c/o Plaza." He is also listed as a person authorized to give and receive instructions on behalf of Moonmouth. Negotiations related to the Subscription Agreement were conducted by Moonmouth, Plaza, and Reijtenbagh. The Subscription Agreement states that the "sources of funds" for Moonmouth's investment in CCC was Plaza's income. Additionally, the letter from the Dutch law firm to the plaintiffs, complaining of losses related to the CCC investment, was sent on behalf of Moonmouth, Plaza, and Reijtenbagh.

*Id.* The court reasoned that its determination was "consistent with Delaware cases in which affiliates, officers, and directors have been held to be bound by forum selection clauses." *Id.* (citing *Baker*, 2010 WL 1931032, at *4) (other citations omitted).

In addition to concluding that Plaza was closely related to the Subscription Agreement such that it could be bound by its forum-selection clause, the court also held that the non-signatory plaintiffs were closely related and could enforce the clause, because they were all affiliates of Carlyle, managed by Carlyle, and directors of CCC or senior executives of Carlyle. *Id.* at 219-20. Finally, the court concluded that the claims arose out of the Subscription Agreement: "Carlyle's claims stem from Moonmouth's initial investment in CCC. Although the releases Carlyle seeks to enforce were part of later agreements, the defendants would not have any claims, nor would Carlyle need to seek release from any claims, but for the original Subscription Agreement that contains the forum selection clause." *Id.* at 220; *see also Howmedica*, 867 F.3d at 407 & n.13 (noting that, although it was not applying the closely related doctrine, the Third Circuit only permits a signatory to a forum-selection clause to enforce the provision against closely

43

related parties (citing *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996))).

### 3. Analysis

Returning to the case before us, we apply the closely related doctrine and hold that the forum-selection clause in the Confidentiality Agreement is enforceable against each of the non-signatory Appellants—ACTP, Evergreen, and Mrs. Peterson. We conclude that the forum-selection provision is valid, that Evapco's claims arose out of the non-signatory Appellants' status in relation to the Confidentiality Agreement, and that the non-signatory Appellants were closely related to the contractual relationship between Mr. Peterson and Evapco, so that it was foreseeable that they would be bound by the forum-selection cause contained in the Confidentiality Agreement. *See Carlyle*, 779 F.3d at 218. To determine whether a non-signatory is closely related such that application of the forum-selection clause would be foreseeable, we look to "the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *Id.* at 219 (citations omitted).

### *1. Mrs. Peterson*

As an initial matter, we conclude that the forum-selection clause found within the Confidentiality Agreement is valid and enforceable. Forum-selection clauses are presumed to be enforceable, *Popular Leasing*, 391 Md. at 282-83, and Appellants have not argued otherwise. *See, e.g.*, *Magi*, 714 F.3d at 720-21.

Second, the question of whether Evapco's claims arose directly from Mrs. Peterson's status in relation to the Confidentiality Agreement, "is very similar to the

question of whether the forum selection clause applies to [the underlying] dispute." *Carlyle*, 779 F.3d at 218. We answer in the affirmative. As the Third Circuit found in *Carlyle*, "[t]he claims in this case are 'with respect to' the [Confidentiality Agreement] and the claims against [Mrs. Peterson] therefore arise from the [Confidentiality Agreement]." *Id.* at 220. Here, the Confidentiality Agreement served as consideration for the sale of TCI, which continued to employ Mr. Peterson on the condition that he did not compete against Evapco. The underlying litigation is entirely derivative of his violation of that condition— together and in concert with Mrs. Peterson and the companies they operated out of their home. *See id.* (citing *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1252 (Del. Ch. 2010) ("An action need not even allege contract-based claims in order for a forum selection clause in a contract to be enforced.")).

Finally, we conclude that Mrs. Peterson was closely related to the contractual relationship between Mr. Peterson and Evapco. Mrs. Peterson was a signatory of the SPA, which paid her and Mr. Peterson nearly four million dollars conditioned on Mr. Peterson signing the Confidentiality Agreement, which was referenced in the SPA. The Confidentiality Agreement stated explicitly that Mr. Peterson signed the agreement "in consideration of the purchase . . . of [his] stock in [TCI]" pursuant to the SPA and set "the Circuit Court for Carroll County" as the exclusive forum for disputes. Mrs. Peterson insists that she had no knowledge of the Confidentiality Agreement's specific provisions— including its forum-selection clause—and could not have expected to be bound by the Agreement. We find her arguments unavailing for several reasons.

Even if Mrs. Peterson did not know of the Confidentiality Agreement's specific

provisions or its choice of Maryland as the forum for disputes, she was, at a minimum, aware that the SPA required Mr. Peterson to sign a non-compete agreement. *See Dashiell v. Meeks*, 396 Md. 149, 167 (2006) ("[A] party who signs a contract is presumed to have read and understood its terms[.]"). In direct violation of that non-compete, she founded Evergreen and ACTP *with Mr. Peterson as co-owner*. Regardless of whether Mrs. Peterson signed a non-compete of her own, she knowingly returned to the cooling tower parts industry with her husband as her business partner while he remained an employee of Evapco and was bound by the Confidentiality Agreement's non-compete. Through her ownership of two companies that benefited financially from Evapco's confidential information, Mrs. Peterson herself derived a direct benefit from Mr. Peterson's breach of the Confidentiality Agreement. *See Carlyle*, 779 F.3d at 219.

Moreover, Mrs. Peterson submitted an affidavit to the circuit court, attesting to the following: "*Until this dispute arose*, I was not aware of the terms of Mr. Peterson's Confidentiality and Intellectual Property Agreement with TCI, including its non-compete and jurisdiction provisions." (Emphasis added). In her deposition, she agreed the dispute arose in November or December 2014 when Evapco filed the initial complaint. Evapco did not sue Mrs. Peterson until the following May when Evapco filed the second amended complaint alleging Mrs. Peterson's tortious interference with Evapco's contractual relationship and prospective advantage. Evapco produced evidence sufficient to establish that, after the dispute arose, Mrs. Peterson continued to co-own and co-operate businesses with Mr. Peterson in competition with Evapco in violation of the Confidentiality Agreement—the terms of which she admitted she was aware of by that point. Put plainly,

46

Mrs. Peterson continued to participate in and benefit from her husband's violation of the Confidentiality Agreement for at least *five months* after she became aware of the Agreement.

It follows, then, that she should have foreseen that she would be bound be the terms of the Confidentiality Agreement's forum-selection clause. Accordingly, we hold that the Circuit Court for Carroll County exercised personal jurisdiction over Mrs. Peterson properly because she was closely related to the Confidentiality Agreement such that she should have foreseen that Evapco would seek to bind her by its forum-selection clause.

## 2. *Evergreen & ACTP*

As we have explained, the forum-selection clause was valid. Additionally, Evapco's allegations against ACTP and Evergreen arose out of the companies' status relating to Mr. Peterson's Confidentiality Agreement with Evapco. Evapco alleged that Mr. Peterson conducted business through ACTP and Evergreen in direct competition with Evapco in violation of the Confidentiality Agreement. As with respect to Mrs. Peterson, the claims in this case are "with respect to" the Confidentiality Agreement and the claims against ACTP and Evergreen, therefore arise from the Confidentiality Agreement. *Carlyle*, 779 F.3d at 220.

Finally, the record demonstrates that Evergreen and ACTP were both closely related to the contractual relationship between Mr. Peterson and Evapco. Mr. Peterson was co-owner and officer of Evergreen and ACTP, as well as ACTP's manager and registered agent. The principal place of business for each LLC was the Petersons' home address and records confirm that Mr. Peterson conducted business on behalf of both entities. Mr.

47

Peterson signed checks on behalf of Evergreen, including multiple checks written to ACTP. Through these checks, combined with wire transfers, Mr. Peterson sent ACTP more than $450,000 from Evergreen. He also signed tax forms and checks on behalf of ACTP, including at least one check to one of TCI's suppliers.

Both LLCs received a benefit from Mr. Peterson's breach of the Confidentiality Agreement. Evergreen and ACTP conducted business directly with Evapco's suppliers and competitors while Mr. Peterson was a TCI employee with access to TCI's confidential and proprietary information. Mr. Peterson conducted business in competition with Evapco using an email named after TCI's product, and even used TCI's copy machine. Although, as Appellants argue, it is true that TCI had at least some knowledge of certain third-party sales through Evergreen, that argument goes to the merits of Appellees' claims—not the enforceability of the Confidentiality Agreement's forum-selection clause. Considering that both companies continued to operate after Mr. Peterson's termination from TCI and Evapco filed suit, it was foreseeable that Evapco would seek to bind ACTP and Evergreen by the Agreement's forum-selection clause despite any arrangement Mr. Peterson believed Evergreen had with TCI at one time. Just as Mr. Hugel did with his two companies, Mr. Peterson "alone involved his two controlled corporations" in the circumstances that led to this dispute. *See Hugel*, 999 F.2d at 210.

Accordingly, we hold that Evergreen and ACTP are closely related to the contractual relationship between Mr. Peterson and Evapco such that it was reasonably foreseeable that the Confidentiality Agreement's forum-selection clause would bind them. Therefore, we hold that the circuit court's exercise of jurisdiction over both companies was

48

proper. To hold otherwise and ignore Mr. Peterson's affiliate companies would, as the Second and Seventh Circuits have cautioned, allow him to evade the full effect of the Confidentiality Agreement's forum-selection clause and undermine the intent of the Agreement. *See Magi*, 714 F.3d at 722; *Adams*, 702 F.3d at 441-42.

## II.

## Spoliation

Appellants claim that the circuit court sanctioned them erroneously for Evapco's own destruction of the files from Mr. Peterson's laptop that TCI seized when they terminated him. Appellants aver that to impose spoliation sanctions, the circuit court must balance Mr. Peterson's degree of fault against the resulting prejudice, although they contend that "Mr. Peterson's 'degree of fault' under these circumstances [wa]s nonexistent and any prejudice to Appellees from the deletion is the result of the actions of their own agent." Additionally, Appellants blame a fire and electrical surge for the destruction of the documents. They also suggest that Appellees were not prejudiced because, as Appellees admit, they were able to recover from third parties "vast amounts" of the documents in question and they were not prevented from putting on their case in any meaningful way. Appellants ask us to vacate the sanctions order and remand "with instructions that Appellees are required to prove liability" before the circuit court may award damages.

In response, Appellees suggest that the circuit court was not clearly erroneous in choosing not to believe Appellants' story that Appellees deleted their own files given the rampant spoliation in this case. At oral argument, Evapco's counsel represented to this Court that TCI did not delete any files permanently but simply removed them from Mr.

49

Peterson's laptop. Further, they remind us that their spoliation claim was not limited to Mr. Peterson's one business computer from TCI, but also included emails from several email accounts and a substantial number of documents that were destroyed after his termination, including those on personal computers to which he admitted deleting.

Appellees maintain that the evidence before the circuit court demonstrated that Appellants acted in bad faith *and* that Appellees were prejudiced. They established bad faith by showing that Appellants destroyed documents over the course of several years, even after Appellees filed suit, and then attempted to cover up their spoliation. Appellees were prejudiced, they contend, because they struggled to uncover copies of these destroyed documents from third parties and never found records for over three million dollars in transactions. Consequently, they maintain that the sanctions the circuit court imposed were within the court's discretion.

### 1. Applicable Law

Judge Paul Grimm has noted that "the doctrine of spoliation is often traced back to the 2[96]-year-old case of *Armory v. Deamirie*, 93 Eng. Rep. 664 (K.B. 1722)." *Goodman v. Praxair Servs. Inc.*, 632 F. Supp. 2d 494, 518 n.12 (D. Md. 2009). The longstanding precept guards against a party "support[ing] its claims or defenses with physical evidence that it has destroyed to the detriment of its opponent." *Cumberland*, *supra*, 226 Md. App. at 697. "The doctrine of spoliation is grounded in fairness and symmetry." *Id.* at 696. Both Maryland's discovery rules and the courts' inherent authority to manage the discovery process "permit sanctions for destruction of evidence." *Id.* at 701 (citing *Klupt v. Krongard*, 126 Md. App. 179, 195-96 (1999)).

In *Klupt*, we adopted a test that the United States District Court for the District of Maryland applied to determine whether sanctions were appropriate for spoliation, requiring:

(1) An act of destruction;

(2) Discoverability of the evidence;

(3) An intent to destroy the evidence;

(4) Occurrence of the act at a time after suit has been filed, or, if before, at a time when the filing is fairly perceived as imminent.

126 Md. App. at 199 (citing *White v. Office of the Pub. Def. for the State of Md.*, 170 F.D.R. 138, 147-48 (D. Md. 1997)).

Upon a finding of spoliation, the trial court has wide discretion to choose a sanction. *Id.* at 201. The trial court's factual determinations are subject to clear error review and "we must decide only whether there was sufficient evidence to support the trial court's findings." *Id.* at 193 (citations and quotations omitted). "Even when the ultimate penalty of entry of a default judgment is invoked, it cannot be disturbed on appeal without a clear showing of abuse of discretion." *Lone v. Montgomery Cty.*, 85 Md. App. 477, 485 (1991). The Court of Appeals has explained, however, that a default judgment "is warranted only in cases of egregious misconduct such as 'wil[l]ful or contemptuous' behavior, 'a deliberate attempt to hinder or prevent effective presentation of defenses or counterclaims,' or 'stalling in revealing one's own weak claim or defense.'" *Manzano v. S. Md. Hosp., Inc.*, 347 Md. 17, 29 (1997) (bracket in *Manzano*) (citations omitted). In *Cumberland Insurance*, we recently analyzed "what puts a case in the dismissal-as-remedy camp versus

the jury-instruction-as-remedy camp[.]" 226 Md. App. at 704. We observed,

> courts that have affirmed dismissals have zeroed in either on a high degree of fault that carries with it intent ( . . . for example, bashing the evidence with a hammer and then lying about it) *or* on a high degree of prejudice (the legal impossibility of mounting a defense where the evidence that has been destroyed lies at the core of the case).

*Id.* (emphasis in *Cumberland*) (citation omitted).

The spoliator in *Klupt* was the inventor of a disposable cardboard videocassette. *Id.* at 184. After a dispute arose out of licensing agreements for his invention, it turned out that Klupt had surreptitiously recorded all his telephone conversations relating to the case and then authored memoranda summarizing these recordings. *Id.* at 184-86. He failed to produce or disclose the existence of either the tapes or the memoranda in response to discovery requests. *Id.* at 185-86. When the existence of these records came to light, Klupt had already destroyed the tapes with a hammer and written dummy memoranda, which he also failed to produce. *Id.* at 188-90, 199. The circuit court dismissed Klupt's claims due to his discovery abuses. *Id.* at 190.

On appeal, this Court noted that, given the evidence, the circuit court had "little choice" but to find that Klupt "had in fact intentionally destroyed evidence." *Id.* at 201. First, "Klupt admitted that he had 'smash[ed the tapes] with a hammer.'" *Id.* at 199. Second, the tapes were responsive to the discovery request of "all documents, including electronically recorded tapes and cassettes, relating to communications between the parties." *Id.* at 200. Third, the court could infer Klupt's knowledge of the tapes' relevance from his "admitted concealment of the tapes and the content of the tapes as discerned from memoranda prepared by Klupt[.]" *Id.* And finally, "by Klupt's own confession in his

52

deposition testimony, he destroyed the tapes as much as six months *after* the appellees had requested their production." *Id.* at 201 (emphasis in *Klupt*). Turning to the trial court's choice of sanction, we held that the court had not abused its discretion in dismissing his case, given Klupt's clear, willful, and contumacious destruction of discoverable evidence. *Id.* at 203.

In *Cumberland*, the destruction of evidence was not so obviously malicious as Mr. Klupt's. 226 Md. App. at 699. In that case, Cumberland, a property insurance company, demolished a property that was damaged in an electrical fire before Delmarva, the electrical company, could inspect the property. *Id.* at 694-96. After Cumberland brought a subrogation claim against Delmarva, the trial court granted summary judgment in Delmarva's favor based on Cumberland's destruction of the property. *Id.* at 693, 696. On appeal, we looked to the four factors set out in *Klupt* and concluded that there was (1) destruction (2) of evidence that was discoverable, (3) done intentionally (4) after the preservation duty arose. *Id.* at 705. Moving on to the sanction imposed, we concluded that the facts demonstrated both fault *and* a high degree of prejudice: Cumberland was at fault for allowing the demolition to go forward and the destruction prejudiced Delmarva by leaving its experts "with no evidence to rule out or rebut *any* of Cumberland's theories." *Id.* at 706-12 (emphasis in *Cumberland*) (footnote omitted). Dismissal was, therefore, appropriate. *Id.* at 712. Even if another court would have imposed a more lenient sanction, we reasoned, it "does not mean that the trial court abused its discretion for deciding not to fashion a more lenient result." *Id.*

## 2. The Destruction of Discoverable Evidence

In the present case, there was sufficient evidence to support a finding that Appellants destroyed discoverable evidence after the preservation duty arose. For example, Evapco produced two three-inch binders filled with responsive records that Appellants claimed to have lost or deleted but Evapco managed to track down through third-party subpoenas. These records included "hundreds of destroyed emails" that Appellants sent to Evapco's competitors *after* Evapco served Mr. Peterson with the initial complaint and well within the two-year timeframe under the Confidentiality Agreement. Compared to the voluminous responsive documents that Evapco managed to uncover through third parties, Mr. Peterson initially produced only 37 emails, none of which were from the two years immediately preceding his termination. Although he eventually produced another 79 emails, he still failed to include numerous emails from both before and after his termination that Evapco eventually discovered. Mrs. Peterson testified that caponen15@yahoo.com was ACTP's primary email address since 2012, but Appellants failed to produce a single record from that account. The Petersons also spoliated other electronic records, including bank records, which would have detailed the full scope of the businesses they operated in competition with Evapco. Evapco's damages expert estimated that records of at least $3 million in transactions were missing at the time Evapco filed the sanctions motion.

If the sheer volume of records that the Petersons deleted, destroyed, or failed to produce somehow falls short of demonstrating intentionality, then one only needs to consider that Mrs. Peterson openly admitted to destroying records after Evapco served her with a subpoena. When asked whether these records were responsive, she responded, "I'm

not – I'm not going to testify to that. I'm going to take it back if I said [they were not responsive]. I just delete. I delete-delete. Anything that's there that I don't want, don't need anymore, I delete." Mr. Peterson, for his part, testified that he could not recall whether or not he deleted emails relating to his cooler tower businesses. He claimed that Yahoo! lost his emails from optigrid@yahoo.com, but third-party subpoenas revealed that, even if Yahoo! had lost some of Mr. Peterson's emails, he deleted hundreds more afterward. The Petersons' shifting stories and excuses—blaming Yahoo! and a lightning storm for their missing records—manifest their scienter. *See Klupt*, 126 Md. App. at 200.

The evidence also supports Evapco's contention that Appellants destroyed responsive records after the duty to preserve arose. TCI fired Mr. Peterson on July 29, 2014, and sent him a letter warning of impending litigation and requesting that he preserve "all Confidential Information and Work Product in your possession, custody or control[,]" including "any documents, including emails, that concern Evapco or any other business that you conducted individually or on behalf of any other person or entity." Yet, Appellants destroyed or otherwise failed to preserve hundreds of emails and physical records relating to their cooling tower businesses even after Evapco filed the initial complaint on December 22, 2014, when Mrs. Peterson recognized that she became aware of the underlying dispute concerning the Agreement. Deposition testimony revealed that Mrs. Peterson's practice of "delete-delete" continued even after Evapco subpoenaed her.

In total, there was ample evidence in the record to support the circuit court's finding

that Appellants intentionally destroyed relevant evidence.[15]

### 3. Default Judgment as a Sanction

We now address the sanction that the trial court imposed for Appellants' spoliation, and in doing so we are cognizant that our review is "narrow" due to "the wide discretion of the trial court to manage the discovery phase of cases before it." *Klupt*, 126 Md. App. at 193. Consequently, we perceive no abuse in the trial court's discretion in holding Appellants in default as a spoliation sanction. The record is replete with evidence of both the "high degree of fault" on the Appellants' part *and* a "high degree of prejudice" to Appellees. *See Cumberland*, 226 Md. App. at 704.

As we just explained, Appellees have cataloged meticulously—at their own expense—the sheer volume of discoverable evidence that Appellants failed to produce, as well as the dodgy answers and elusive excuses that Appellants provided to explain the absence of discoverable material. Although Appellants may not have smashed discoverable tapes with a hammer, *cf. Klupt*, 126 Md. App. at 199-200, Appellants' behavior here is no less evasive or egregious. Even if we were to grant Appellants more deference than they are owed at this stage of the case and accept that thousands of documents disappeared due to poor recordkeeping, the record still indicates that Appellants' poor recordkeeping was the result of bad faith, given that the destruction of

---

[15] Appellants' bare assertion that TCI spoliated files from Mr. Peterson's work computer does not change this point. Appellees assert that TCI had not deleted those files but simply removed them from Mr. Peterson's computer. Considering the abundant evidence of spoliation by Appellants, it was not clear error for the circuit court to believe Evapco over Appellants on this point.

evidence continued *after* Mr. Peterson's termination from TCI and *after* Evapco filed suit.

Under applicable decisional law, Appellants' high degree of fault, alone, was sufficient to support the sanction imposed. *See Manzano*, 347 Md. at 29; *Cumberland*, 226 Md. App. at 704. But Evapco also established significant prejudice resulting from Appellants' spoliation. Aside from the time and money that Evapco expended due to Appellants' widespread discovery violations, Evapco's damages expert testified that records detailing another $3 million in transactions were still missing despite Evapco's efforts. So, although Appellants did not completely deprive Evapco of an opportunity to present a case, *see Cumberland*, 226 Md. App. at 711-12, the records destroyed were certainly central to their case. And, given the nature of this case and the surreptitious behavior alleged, the spoliation left Evapco uncertain as to whether they managed to uncover the full extent of Appellants' fraud and deceit. Just because another court may have fashioned a more lenient sanction does not mean the circuit court here abused its discretion by finding Appellants in default for their discovery violations. *See id.* at 712.

In sum, we conclude that Evapco proved all four prongs of the test adopted in *Klupt*, 126 Md. App. at 199, to determine whether sanctions are appropriate in a spoliation case. Therefore, we hold that the circuit court did not abuse its discretion by entering judgment in default against Appellants and in favor of Evapco on each count of the third amended complaint.

## III.

## Right to a Jury Trial

Appellants assert that the circuit court erred by refusing to provide them a jury trial.

Appellants believe that the court mischaracterized Maryland Rule 2-325(b), which limits the ability of a party in default to demand a jury trial on damages following a default. That rule is inapplicable here, Appellants maintain, because they timely demanded a jury trial and were not in default.

In response, Appellees argue that Appellants, the defendants below, were not entitled to a jury trial on remedies, because Maryland Rule 2-433(a) provides that when a trial court enters a default for "a failure of discovery," it shall preserve *the plaintiffs'* right to a jury trial. Contrary to Appellants' contention, Appellees aver that Rule 2-325(f) applies regardless of the reason the court finds a defendant in default.

Maryland Rule 2-433(a)(3) provides that "the court, if it finds a failure of discovery, may enter . . . a judgment by default that includes a determination as to liability and all relief sought by the moving party against the failing party if the court is satisfied that it has personal jurisdiction over that party." Regarding the right to a jury trial, the rule states:

> **If, in order to enable the court to enter default judgment, it is necessary to take an account or to determine the amount of damages or** to establish the truth of any averment by evidence or to make an investigation of any matter, the court may rely on affidavits, **conduct hearings** or order references as appropriate, and, **if requested, shall preserve *to the plaintiff* the right of trial by jury.**

*Id.* (emphasis added).

Rule 2-433 expressly limits to the plaintiff the right to request a jury trial to determine damages after the court enters a default judgment. Although Evapco had initially requested a trial by jury, Maryland Rule 2-325(f) permits a party who has elected for a jury trial to withdraw that election "with the consent of all parties not in default."

Here, the circuit court found all four defendants to be in default. Therefore, Appellees were free to withdraw their election, and Appellants, in default, were left with no right to object or request a jury for the remedies hearing. We observe no error on the part of the circuit court in denying the defendants' request for a jury for the remedies hearing.

## IV.

## Continuance

Appellants' fourth claim on appeal is that the circuit court erred by refusing to grant a continuance despite knowing that Mrs. Peterson was sick and could not attend trial and that Appellants' counsel had withdrawn his appearance recently. They claim the circuit court's decision that the hearing continue resulted in Mr. Peterson representing himself *pro se* and left the other Appellants unrepresented, unable to provide any defense. To demonstrate error, Appellants liken this case to *In re McNeil*, 21 Md. App. 484 (1974), a custody trial that proceeded despite the appellant's absence, which we later reversed on appeal as a "grave and serious error."

Appellees counter that the circuit court exercised its discretion properly by not granting a continuance because, as the court observed, no Appellant asked for a continuance. Instead, three of the four Appellants failed to appear, and Mr. Peterson complained about his counsel's withdrawal without stating a desire to retain replacement counsel. Thus, Appellees contend, Appellants did not preserve for appeal the issue of whether the circuit court erred by failing to grant a continuance. Alternatively, if we consider the issue, Appellees urge us to distinguish *In re McNeil* factually because that case dealt with a parent's fundamental right to be present at a custody proceeding.

59

Appellants reply that, although Mr. Peterson may not have framed the issue perfectly, "he expressed his concerns about continuing to trial without addressing [his desire to be represented by counsel]." According to Appellants, the circuit court "clearly understood the relationship between Mr. Peterson's requests and postponement[,]" and Appellees' preservation argument "sterilized by its legal formalism, wipes away all context[,]" including that Mr. Peterson was a *pro se* litigant. The injustice of this "became manifest," Appellants argue, when Mr. Peterson was forced to proceed to trial without his wife present and was unable to review documents or present evidence related to her or the other Appellants.

Appellants conflate several grievances into one issue and do so despite having failed to preserve the issue to begin with. *Johnson v. State*, 457 Md. 513, 528 n.15 (2018) ("[A]n appellate court will 'ordinarily' address only issues that have been preserved in the trial court." (citing Md. Rule 8-131(a)). To the extent Mr. Peterson "expressed his concerns," he did so only regarding the court's denial of his request for a jury trial and the court permitting his attorney to withdraw. The court informed him that he was not entitled to a jury trial because he was in default and that any dispute about evidence in his former attorney's possession was between him and his attorney. Regarding Mrs. Peterson, all Mr. Peterson said to the court was that Mrs. Peterson "was not able to come; she has a medical condition." He also apparently brought a doctor's note for his wife, but at no point did he intimate in the slightest that he would like the court to delay proceedings for his wife to be present (or for any other reason). Even granting substantial leeway to Mr. Peterson as a *pro se* litigant, we cannot discern from the record before us any attempt to seek a

continuance. This issue was not preserved for our review.

## V.

### Confronting Witnesses

Next, Appellants contend that the circuit court erred by refusing to permit Mr. Peterson to use Evergreen's and ACTP's records to cross-examine witnesses even though Mr. Peterson was jointly and severally liable for damages that the two entities allegedly caused. Citing to no law—constitutional, statutory, decisional, or otherwise—Appellants suggest that "[i]n short, these evidentiary rulings have no basis in law, are fundamentally unjust, and deprived Mr. Peterson of a fair trial."

Appellees respond that the circuit court did not refuse to permit Mr. Peterson to defend himself, rather it refused to permit him to present a defense on behalf of two corporate entities that he was not authorized to represent—a ruling that is consistent with Maryland Rule 2-131(a)(2), which mandates that corporations be represented by an attorney in court. That Mr. Peterson was facing joint and severable liability is of no consequence, Appellees maintain. In the event there was error, Appellees suggest that error was harmless because Appellants have not met their burden of establishing how the court's rulings impacted the outcome of the remedies hearing. Appellees do not believe Appellant can satisfy this burden with an unsupported contention that the court deprived him of his ability to use admissible evidence to prove Appellees were not entitled to the damages they sought. Moreover, Appellees conclude, there was no prejudice because the weight of the evidence supported the court's ruling and Appellants failed to present any rebuttal evidence or challenge the methodology of Evapco's expert.

61

Under Maryland Rule 2-131(a)(2), "a person other than an individual may enter an appearance only by an attorney." A person, as defined by Maryland Rule 1-202(t), "includes any individual, general or limited partnership, joint stock company, unincorporated association or society, municipal or other corporation, incorporated association, limited liability partnership, **limited liability company,** . . . or any government entity." Based on these Rules, Evergreen and ACTP—two LLCs—"must be represented by [counsel] in civil proceedings in a circuit court." *Finch v. LVNV Funding, LLC*, 212 Md. App. 748, 755 n.3 (2013). Mr. Peterson arrived at trial without counsel or his co-defendants. The circuit court, therefore, did not err in prohibiting Mr. Peterson from presenting a defense on behalf of Evergreen and ACTP—two LLCs which were not represented by counsel as required by Maryland Rule 2-131.

## VI.

### Due Process

After presenting their five issues on appeal, Appellants briefing continues, making a sixth argument—that the cumulative effect of the circuit court's errors deprived Appellants of their constitutional right to due process. Among the errors listed in this section are the errors alleged above, as well as some that are not, such as the circuit court's disqualification of Appellants' expert witness on damages and unspecified time(s) when the circuit court prevented Mr. Peterson from objecting to hearsay.

We decline to address Appellants' catch-all argument "because [it was] not set forth in the 'Questions Presented' section of appellants' brief." *Green v. N. Arundel Hosp. Ass'n, Inc.*, 126 Md. App. 394, 426 (1999), *aff'd*, 366 Md. 597 (2001) (citing Md. Rule 8-

504(a)(3)).  As we stated in *Green*, "Appellants can waive issues for appellate review by failing to mention them in their 'Questions Presented' section of their brief."  *Id.*  We reasoned that "[c]onfining litigants to the issues set forth in the 'Questions Presented' segment of their brief ensures that the issues are presented and obvious to all parties and the Court."  *Id.* (citing *DiPino v. Davis*, 354 Md. 18, 56 (1999)).  We see no reason to stray from that rule in this case.

**JUDGMENTS OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018